IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs April 7, 2020

**STATE OF TENNESSEE v. KIMBERLY ANN LENNON**

**Appeal from the Circuit Court for Henderson County**
**No. 18121-3    Kyle Atkins, Judge**

_____

**No. W2019-01008-CCA-R3-CD**

_____

The Defendant, Kimberly Ann Lennon, was convicted by a Henderson County Circuit
Court Jury of driving under the influence, a Class A misdemeanor. *See* T.C.A. § 55-10-
401 (2017).  The trial court sentenced her to eleven months and twenty-nine days at 75%
service, to be served on probation, supervised by the community corrections program,
after two days' jail service.  On appeal, the Defendant contends that the evidence is
insufficient to support her conviction.  We affirm the judgment of the trial court, and we
remand the case for correction of a clerical error on the judgment form.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed;**
**Case Remanded**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which CAMILLE
R. MCMULLEN and ROBERT L. HOLLOWAY, JR., JJ., joined.

George Morton Googe, District Public Defender; Brennan M. Wingerter (on appeal),
Assistant Public Defender – Appellate Division; and Kandi Kelley Collins (at trial),
Assistant District Public Defender, for the Appellant, Kimberly Ann Lennon.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant
Attorney General; Jody Pickens, District Attorney General; Eric Wood, Assistant District
Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Defendant's conviction relates to events surrounding an automobile collision
in which she was not the at-fault driver.

At the trial, Tennessee Highway Patrol Trooper Joshua Potts testified that his
training included Advanced Roadside Impaired Driving Enforcement, which "teaches

you to detect impairment other than alcohol." He said he was an instructor for this program, as well. He said he was, at the time of the trial, a certified field sobriety task instructor and a certified drug recognition expert, but he acknowledged he did not hold these certifications at the time he arrested the Defendant. In addition, his initial training involved investigation of alcohol- and drug-related offenses.

Trooper Potts testified that on December 3, 2017, he was dispatched to the scene of a two-car wreck around 3:06 a.m. and that he arrived around 3:47 a.m. He said a deputy was already at the scene and had spoken with the drivers of both cars. Trooper Potts said he spoke with the deputy to obtain a "brief rundown." Trooper Potts said the driver other than the Defendant "basically admitted" she ran a stop sign and "ran out in front of" the Defendant. He said the Defendant's SUV had minor damage to the front driver's side and that the other car had damage on the rear driver's side. He said that both cars were drivable and that no injuries were reported.

Trooper Potts said he first made contact with the Defendant when she was seated in her SUV. He said the weather was cool. He said he asked the Defendant to get out of the SUV and that she stepped away from the SUV. He said he smelled alcohol, that he asked her about the wreck, and that he asked her how much alcohol she had drunk. He said that she initially denied drinking alcohol but that later she admitted drinking alcohol.

Trooper Potts testified that when he made contact with an individual, he looked immediately for indicators of impairment. He said that in addition to noticing the odor of alcohol when he spoke with the Defendant, he smelled marijuana when she got out of the SUV. He said she denied smoking marijuana. He thought she stated her passenger had smoked marijuana and had drunk alcohol. He said the Defendant's eyes were bloodshot and watery and that her speech was "slurred somewhat." When asked if her bloodshot, watery eyes could have been attributed to the time of 3:00 a.m. and her being tired, he said, "Could have been anything." He characterized her as cooperative. He said she spoke rapidly, loudly, and was "very talkative." He said, "I think that's her personality." He said the Defendant told him that she had taken prescription medication about 10:00 a.m.

Trooper Potts testified that his patrol car was equipped with a dashboard camera. He identified a video recording of his encounter with the Defendant. The video recording was played for the jury.[1] In the recording, an officer relays the facts of the wreck to

---

[1] The record reflects that the original video recording had been redacted. The court asked before the recording was played. "Does it have the parts taken out that were taken out?" Defense counsel responded, "He's going to stop and start." The exhibit which has been provided to this court is marked "Unredacted." The record contains an order, denoting that it was entered by agreement, excluding evidence of the horizontal gaze nystagmus test. No order or hearing transcript directly addresses

-2-

Trooper Potts and states, "I think she has been drinking a little." The Defendant gets out of her SUV, stands by the open driver's door, and appears to search for something on the driver's seat of her SUV. Trooper Potts approaches the Defendant, and they converse standing outside her SUV.[2] He asks her if she has been drinking, and she says she has not. He asks if anyone in the SUV has been drinking, and she points inside the SUV to the passenger and says, "Him." Trooper Potts asks if the Defendant is hurt, and she says she is not but that she is "shook up a little bit." Trooper Potts steps away to speak to the other officer, and the Defendant walks to the back passenger side of her SUV and retrieves and puts on a jacket. Trooper Potts advises the other officer that he plans to have the Defendant perform field sobriety tests. Trooper Potts approaches the Defendant and asks her if she has any medical issues, to which she responds that she takes medication and that she has spinal stenosis, disc disease, and back problems. She states she does not work and is disabled. She states that she cannot stand, walk, or lift more than five pounds. When Trooper Potts states that she seems to walk without difficulty, she states that she "just had a shot from the doctor two days ago." She says she last took medication "this morning, ten o'clock." She denies that she has consumed any alcohol. Trooper Potts instructs the Defendant in the walk-and-turn test, and she states, "I probably am not going to be able to do it." The Defendant is unable to complete the test without raising her arms, contrary to Trooper Potts's instructions to keep her hands at her sides. She protests that her leg is going to "give out." After completing the turn, she briefly loses her footing. At one point, the Defendant stops the test, turns to talk to Trooper Potts, then turns and resumes the test. The Defendant acknowledges that her performance was "awful," and Trooper Potts agrees. Trooper Potts administers the one-leg stand test, and the Defendant is able to attempt the test for eighteen of the required thirty seconds. The Defendant's side faces the camera, and the arm on the side that is visible in the recording is partially raised, rather than at her side per Trooper Potts's instructions. Trooper Potts administers the finger-to-nose test, and the Defendant is able to complete the test. Trooper Potts asks the Defendant to rate her level of intoxication on a scale of zero to ten, and her response is unintelligible. He states that it is obvious she has been drinking alcohol. She states she takes her medication as prescribed but that her alcohol intoxication level was zero. She states that her passenger is intoxicated. She states that the woman who caused the wreck did not want to "call the law" and that the Defendant was the person who called the authorities. She states repeatedly that she had

redaction of the video recording. Based upon the record before us, we have considered all of the video recording, other than any evidence related to the horizontal gaze nystagmus test. *See* T.R.A.P. 24(a), (b) (stating that it is the duty of the appellant to ensure that the record conveys a fair, accurate, and complete account of what transpired in the trial court as related to the issues raised on appeal).

[2] Some of the audio is of a quality that cannot be heard or understood, and our account of their conversation necessarily lacks the unintelligible portions.

not had any alcohol. Trooper Potts handcuffs the Defendant and advises her that she was under arrest.

In the recording, the Defendant is talkative throughout the encounter outside her SUV and after Trooper Potts arrests her. Trooper Potts places the Defendant in his patrol car. Trooper Potts and the other officer approach the Defendant's SUV after arresting her and ask her passenger if anything illegal is in the SUV and if he has smoked marijuana. Trooper Potts begins driving, and the Defendant talks almost constantly, although most of her speech is unintelligible on the recording that has been provided to this court. She asks for her cigarettes. At one point, Trooper Potts tells her to "chill out" and says, "You're spazzing out on me." When Trooper Potts asks about a blood test, the Defendant says that the test would be "fine" and that she knows what is in her system. Trooper Potts parks and gets out of the car to speak to the occupants of the car that pulled out in front of the Defendant. After Trooper Potts returns to the car he asks the Defendant if she has been "doing drugs," and she says she has not. Trooper Potts leaves the car a second time to issue a citation to the driver of the car who caused the wreck. Trooper Potts returns to his car, and the Defendant continues talking. He asks her to "calm down." She complains of anxiety, and he tells her that she is going to give him anxiety. The Defendant eventually begins talking less. Trooper Potts tells the Defendant that she has ten days to report the wreck to her insurance company. Trooper Potts reads a consent form for the blood sample to the Defendant and asks her to indicate on the form if she consents to give a blood sample.

Trooper Potts testified that he noticed a strong smell of alcohol when he approached the Defendant. He said that she was already out of her SUV and that he had her step away from the SUV in order to determine whether the smell of alcohol was coming from her or from her intoxicated passenger. He said this also helped eliminate any residual odor of alcohol from inside the SUV.

Trooper Potts testified that in administering the walk-and-turn test, he looked for eight clues of impairment. He said the presence of two or more of the clues had been shown in studies to indicate a blood alcohol level of 0.08 or greater with an accuracy rate of 78%. He said that the Defendant had six clues of impairment: stopped walking, stepped off the line, missed heel-to-toe, raised her arms, and took an improper number of steps.[3] He said that he took nervousness and cold weather into account when administering the tests. Trooper Potts said that although the Defendant stated she could not stand or walk, he had seen her do these things before he administered the test. He noted that the Defendant bent over at one point on the video recording and that he did not know how someone in pain would have been able to do this. He said that a person's

---

[3] Although Trooper Potts testified that the Defendant had six clues of impairment, he listed five.

-4-

disabilities were taken into account in assessing the person's performance on field sobriety tests.

Trooper Potts testified that if he noted at least two clues of impairment on the walk-and-turn test, he proceeded to the one-leg-stand test. He said that he administered the one-leg-stand test on the Defendant and that she exhibited two of four possible clues of impairment: she swayed and raised her arms. He said the test had been shown to have an accuracy rate of 83% at detecting whether an individual was intoxicated at or above the legal limit.

Trooper Potts testified that because the Defendant stated she had disabilities, he had her perform the finger-to-nose test. He said this test, unlike the previous two, did not have specific criteria for determining an individual's intoxication level, but that it was used to see if an individual's performance was "consistent with what we're already seeing." He said the Defendant missed the tip of her nose twice and was "somewhat hesitant on the others." He said that this test was "more associated with drug use" and that it tested coordination. He said that the Defendant's performance on the test was consistent with her being impaired.

Trooper Potts testified that he arrested the Defendant after administering the field sobriety tests. He said the Defendant was adamant that she had not consumed any alcohol and that she had not used illegal drugs. He noted that she said she had taken prescription medication.

Trooper Potts testified that after he had the Defendant in the backseat of his patrol car, she made a statement about having been at a bar earlier. He said the Defendant asked questions about whether she "was being charged with the alcohol part or . . . the drug part." He said she was adamant that no alcohol was in her system.

Trooper Potts testified that he read the implied consent form to the Defendant and that she consented to give a blood sample to determine if alcohol and drugs were in her system. He said that while the Defendant sat in his car, he wrote a citation for the driver who was at fault in the wreck. He said that he and the Defendant arrived at the hospital laboratory for the blood draw at 5:40 a.m. A form noting the time of the blood draw at 5:40 a.m. was received as an exhibit. He said he asked for her blood to be screened for alcohol, drugs, and marijuana. He said the Defendant had been adamant that she had not done anything illegal and that he told her he did not want to take anyone to jail and "get it wrong." He said he tried to get the Defendant to admit what he "was seeing." He said that, based upon his observations, he did not second-guess his decision to arrest her.

Trooper Potts testified that, based upon his training and experience, he thought the Defendant was under the influence. He said that he had smelled the odor of alcohol

-5-

coming from her, that he smelled the odor of marijuana from her SUV, and that he observed several clues of impairment. He noted that the Defendant said she had taken medication and that some medication required the person taking it not to operate a car or heavy machinery. He said that he might not arrest a person based solely upon the odor of alcohol but that he arrested the Defendant based upon the totality of the circumstances. He said that in his opinion, the Defendant could not drive safely that night.

Trooper Potts testified that the Defendant made a statement once she was in his patrol car that she "had left a bar." He thought she made this statement after her blood sample had been drawn. He said that he and the Defendant "made a lot of conversation" after the blood draw. He said that the conversation was friendly and that he thought she felt comfortable admitting that she had consumed alcohol.

Trooper Potts testified that if someone drank a lot of alcohol daily, the person might be able to function despite having a blood alcohol concentration that exceeded the legal limit.

Tennessee Bureau of Investigation (TBI) Special Agent Forensic Scientist Julian Conyers, an expert in forensic toxicology, testified that he tested the Defendant's blood sample and determined that the alcohol content was 0.062 gram percent. He said that with this level of blood alcohol concentration, he would expect a person to show "slowed information processing, diminution in memory perception and comprehension, some impairment maybe in sensory-motor areas." He said those things would affect a person's ability to operate a motor vehicle. The TBI laboratory report was received as an exhibit.

Agent Conyers testified that 0.01 to 0.02 gram percent of alcohol was eliminated from the blood in one hour. He said that, in his opinion, if a person drove at 3:10 a.m. and had a blood sample taken at 5:40 a.m., a blood alcohol concentration result of 0.062 gram percent would mean the person's blood alcohol concentration would have been 0.08 to 0.12 at the time the person drove at 3:10 a.m. He acknowledged that he would need further information, such as a person's weight, to make an exact determination of what the person's blood alcohol level would have been at 3:10 a.m. He said his estimate assumed the person had stopped drinking for one hour before driving.

Allison Clay, who had been formerly employed by the TBI as a special agent forensic scientist, testified as an expert in forensic toxicology. She said she tested the Defendant's blood sample for drugs and did further testing for benzodiazepines based upon the results of the initial testing. She said that the Defendant's blood sample contained nine nanograms per milliliter of alprazolam and that no other drugs were detected. She said the presumptive testing indicated the possibility of cannabinoids. She said that the Memphis TBI Laboratory did not have the equipment for further testing for

cannabinoids and that the sample was sent to the Nashville TBI Laboratory for this purpose.

Ms. Clay testified that alprazolam, also known as Xanax, was a central nervous system depressant and agreed it had an impairing or sedative effect on a person. She said a person who took alprazolam over time and depending on the dosage might become tolerant and notice fewer effects of the drug. She thought the normal half-life for alprazolam to "start working out of your system" was around twelve hours. She later stated the half-life occurred at eleven to fifteen hours. She said the therapeutic range for alprazolam was twenty-five to 102 nanograms per milliliter. She said that alprazolam mixed with alcohol would increase the effects normally seen with alcohol because both were central nervous system depressants.

TBI Special Agent Forensic Scientist April Bramlage, an expert in forensic toxicology, testified that she analyzed the Defendant's blood sample for "THC and its metabolites," which she said were found in cannabis and marijuana. She determined that the sample contained three nanograms per milliliter of delta9-tetrahydrocannabinol(THC), four nanograms per milliliter of 11-hydroxy-delta9-THC, and thirty-seven nanograms per milliliter 11-nor-9-carboxy-THC. Ms. Bramlage's report was received as an exhibit.

Agent Bramlage testified that marijuana was a central nervous system depressant. She said that a person who had ingested marijuana would have trouble multitasking. She said that in the case of driving after ingesting marijuana, the effects might include trouble staying in the proper lane while trying to do a second task, such as changing the radio station or "yell[ing] at kids in the back seat." She said a driver who had ingested marijuana might have difficulty reacting to driving situations that might arise, such as a car stopping in front of them, might have a slowed perception of the passage of time, and might have impaired short-term memory.

Agent Bramlage testified that delta9-THC was the "first drug that hits you when you smoke marijuana." She said that the length of time it remained in a person's blood varied. She said that a chronic user, meaning a person who smoked marijuana more than four times per week, could have residual amounts of delta9-THC in their system "for days." She agreed that a chronic user might consistently have THC levels in the person's blood that were around the levels detected in the Defendant's blood. She said that a person who smoked marijuana less than twice per week could have the delta9-THC eliminated from their system within twenty-four hours. She said the 11-hydroxy-delta9-THC is "that active metabolite that the first drug very quickly turns into." She said it had "the same effects as the parent drug." She said that 11-nor-9-carboxy-THC was inactive, meaning it had no effect on the person who had ingested marijuana. She said it merely indicated that the person had ingested marijuana at some previous time. She said it was

"possible" that the presence of delta9-THC and 11-hydroxy-delta9-THC could cause impairment, depending on the person's "use history."

Agent Bramlage testified that the consumption of alcohol and marijuana together had a significant effect on the level of impairment in an individual. She stated, "They add to each other quite significantly." She said that studies showed, "[I]ndividuals have lower than per se, so small amounts of alcohol and small amounts of THC, and the effect you see is if you had a lot of one of them." She said, "So just a little bit of each one together causes an increased effect together." When asked about the effects of a blood alcohol concentration of 0.062 on a person who had also "smoked alcohol [sic]," she stated that the effects would "more than likely" be greater.

When asked if the test results indicated that the Defendant had ingested marijuana within a few hours of the wreck, Agent Bramlage testified, "The shortest time period I would . . . say would be 24 hours." She said that a person who smoked marijuana once or twice a week and who had blood levels like the Defendant's would feel impairment if the person had smoked within the past four hours.

When asked if a person might have THC metabolites in the person's system from "secondhand smoke," Agent Bramlage testified that this was "[v]ery unlikely."

The Defendant testified that she had been disabled since 2003 and that she obtained approval for disability benefits in 2009. She said her physical and mental diagnoses included spinal stenosis, degenerative disc disease, bone spurring, depression, and anxiety. She said she had been prescribed Xanax since approximately 1998. She said that at the time of her arrest, she was prescribed one milligram twice per day. She said she had taken her medication on the day of the wreck and that she normally took it "between 8:00 and 10:00." She later agreed that she took Xanax on the morning before the wreck at 10:00 a.m. and that she did not take her evening dose. She said she had used marijuana "for medical purposes for 20 years." She said she did not smoke marijuana daily because she could not afford it. She estimated that she smoked it two to three times per week in December 2017. She said that she had used it with greater frequency "years ago." She said she drank alcohol socially, which she said was about once every ten days in December 2017. She then said she might have drunk alcohol "maybe more than once a week."

The Defendant testified that combining Xanax and alcohol made her feel "high." She estimated that she had last smoked marijuana on Wednesday, Thursday, or Friday before her arrest early on Sunday morning.

The Defendant testified that on December 2, 2017, she went to a friend's house around 4:00 to 5:00 p.m. to celebrate a friend's birthday. She said the group played

games and ate pizza. She said she drank two "Smirnoff beers." She said she left around 10:00 to 11:00 p.m. She said she went "to Timberlake" and to Johnathan McMullen's house. She said Mr. McMullen was her passenger when she was arrested. She said she stayed at Mr. McMullen's house for about two hours and that they went to "play pool at Crossroads" around 12:30 a.m. She said that they played three games, that she drank two more Smirnoff beers, and that they left around 2:00 a.m. She said they left immediately after she drank the Smirnoff beers.

The Defendant testified that she had denied drinking alcohol multiple times when questioned by Trooper Potts because she panicked. She said she knew she was not impaired and that she later admitted to him that she had consumed alcohol. The Defendant said that Mr. McMullen had been drinking all day. The Defendant said she had not felt impaired to drive.

Regarding the wreck, the Defendant testified that the other car went "right in front of [her] completely." She said she "jammed on brakes" to try to avoid a collision but that she hit the back of the other car. The Defendant said, "There was . . . absolutely nothing I could do." She said she pulled to the side of the road and called 9-1-1. She said she waited about forty-five minutes for an officer to arrive. She said the situation was "overwhelming." She said that she was sore but not hurt and that she was a "nervous wreck inside." She said she was nervous when Trooper Potts arrived. She said she thought he had come to help her but that he made her "walk a line" despite her concerns she could not physically perform the task. When asked if she felt impaired, she responded, "Not at all." She said she did not think she was unable to operate a car safely.

The Defendant testified that she was nervous when Trooper Potts administered the field sobriety tests. She said Mr. McMullen "was clearly . . . drunk and intoxicated." She said she knew the smell of alcohol that Trooper Potts mentioned had come from Mr. McMullen. The Defendant said the one-leg-stand test was uncomfortable and that she was "very uneasy." When asked if she experienced back or hip pain during the field sobriety tests, she said, "No. . . . It was more of a shock . . . that the accident just happened."

The Defendant testified that she was upset after she was handcuffed and seated in the back of the patrol car because she "didn't think it was fair[.]" She said that she asked to take a Breathalyzer test and that she agreed to a blood test because she knew she was not impaired. When asked if she had been surprised by the blood test results, she said, "I was surprised that there wasn't more Xanax in my bloodstream." She recalled that she told Trooper Potts repeatedly that she suffered from anxiety. She said that after they left the hospital, he stated, "You have me second-guessing myself." She said that, at this point, she admitted drinking two beers at a bar.

The Defendant testified that her Xanax prescription was for use as needed and that she usually took her evening dose when she went to bed. She said no one had smoked marijuana in her car on the day of the arrest. She did not recall discussing the smell of marijuana with Trooper Potts. She estimated that she had her last drink of alcohol thirty minutes before the wreck occurred. She said she had "a lot of emotions" when she was performing the field sobriety tests. She said she had a handicapped hangtag on her SUV. She said she had smoked cigarettes in her car on the night of her arrest.

The jury found the Defendant guilty of DUI. This appeal followed.

The Defendant contends that the evidence is insufficient to support her conviction. She argues that her toxicology results were below legal and therapeutic limits and that her physical and mental disabilities skewed the results of her field sobriety tests. She argues that the objective evidence, consisting of the video recording of her encounter with Trooper Potts and the toxicology reports, contradicts Trooper Potts's subjective conclusion that she was impaired and provides objective evidence that she was not intoxicated. The State counters that the evidence is sufficient. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

> It is unlawful for any person to drive or to be in physical control of any automobile or other motor driven vehicle on any of the public roads and highways of the state, or on any streets or alleys, or while on the premises of any shopping center, trailer park, or apartment house complex,

or any other premises that is generally frequented by the public at large, while:

> (1) Under the influence of any intoxicant, marijuana, controlled substance, controlled substance analogue, drug, substance affecting the central nervous system, or combination thereof that impairs the driver's ability to safely operate a motor vehicle by depriving the driver of the clearness of mind and control of oneself that the driver would otherwise possess[.]

T.C.A. § 55-10-401(1).

Viewed in the light most favorable to the State, the record reflects that the Defendant drank four Smirnoff beverages in the hours before the wreck, consuming two before about 10:00 p.m. on December 2 and two before about 2:00 a.m. on December 3. She had a blood alcohol level of 0.062 gram percent at 5:40 a.m. In addition, she had a sub-therapeutic level of alprazolam in her system and active and inactive metabolites of marijuana. Expert testimony showed that alcohol, alprazolam, and marijuana were central nervous system depressants and that the use of multiple central nervous system depressants could have a synergistic effect in impairment of an individual. An expert witness estimated that a person with a blood alcohol level of 0.062 gram percent at 5:40 a.m. would have had a blood alcohol level in the 0.08 to 0.12 gram percent range at 3:10 a.m. Trooper Potts testified that the Defendant performed poorly on the three field sobriety tests he administered. He also testified that he smelled the odor of alcohol after the Defendant stepped away from her SUV and that he smelled the odor of marijuana after he approached the SUV. The Defendant's arguments essentially invite this court to consider the video recording and the laboratory results and to discredit Trooper Potts's testimony and the expert testimony regarding the effect of combining alcohol with marijuana and alprazolam. In order words, she invites us to reweigh the evidence, which we cannot do. *See Bland*, 958 S.W.2d at 659. Although the Defendant cites *State v. Binette*, 33 S.W.3d 215 (Tenn. 2000), we note that the evidence in that case, which involved the determination of a question of law, consisted *entirely* of video evidence and a law enforcement officer's contradictory recorded narration of the video evidence. *Binette*, 33 S.W.3d at 219. In that context, our supreme court said that an appellate court's review of the evidence should be conducted de novo, without any deference to the trial court as the finder of fact in a motion to suppress. *See id.* In the present case, we have reviewed all of the evidence, including the video recording, from which we conclude that the evidence is sufficient to support the Defendant's conviction. The evidence presented at the trial included the video evidence, the testimony of Trooper Potts, the expert testimony from three TBI witnesses, and the Defendant's testimony. Viewed in the light most favorable to the State, the evidence supports the Defendant's conviction. She is not entitled to relief on this basis.

-11-

Finally, as a matter of plain error, we note that the transcript of the sentencing hearing reflects that the trial court ordered the Defendant to serve her sentence on "probation supervised by Community Corrections" after service of forty-eight hours, but the judgment form incorrectly states that the Defendant was sentenced to community corrections after service of forty-eight hours. A sentence to community corrections is available to certain felony offenders, and the Defendant was convicted of a misdemeanor. *See* T.C.A. § 40-36-103(1) (2019). Further, when a conflict exists between the transcript and the judgment, the transcript controls. *See, e.g.*, *State v. Davis*, 706 S.W.2d 96, 97 (Tenn. Crim. App. 1985). Therefore, we remand the case to the trial court for correction of the judgment form to reflect that the sentence is to be served on probation, with supervision by the community corrections program. *See* Tenn. R. Crim. P. 36 (providing for correction of clerical mistakes in judgments)

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed, and the case is remanded for correction of the judgment form.

_____
ROBERT H. MONTGOMERY, JR., JUDGE